Filed 11/5/25  P. v. Smithson CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C100499 |
| Plaintiff and Respondent, | (Super. Ct. No. 21FE012256) |
| v. | |
| FARD SMITHSON, | |
| Defendant and Appellant. | |

Defendant Fard Smithson shot and killed his girlfriend, Keela Cole.  He appeals from his conviction of first degree murder and possession of a firearm by a felon.  He contends the trial court (1) denied him his right to present a defense by precluding him from introducing third party culpability evidence and arguing in favor of third party culpability; (2) abused its discretion by denying his motion for mistrial based on prosecutorial misconduct in closing argument; (3) abused its discretion by denying his motion for mistrial based on a witness's testimony of his prior infidelity; (4) improperly instructed the jury on suppression of evidence as evidence of consciousness of guilt; and (5) abused its discretion when it denied his motion for new trial based on newly discovered evidence.

1

We affirm the judgment.

FACTS AND HISTORY OF THE PROCEEDINGS

A.    The People's case

1.    Percipient witness testimony

Defendant and the victim, Keela Cole, shared an "off and on" romantic relationship.  They lived together in a ground floor apartment at the end of an apartment building.  (Because Keela's sister, Tyra Cole, testified at trial, we refer to the siblings by their first names.)

Late on July 19, 2021, Shayla Taylor, LeAndrew Smith, and Antoinette Damphier arrived at Keela's and defendant's apartment.  Each were friends with both defendant and Keela.  Taylor's relationship with defendant had included sex on one or two occasions.  Smith at the time was sleeping with both Taylor and Damphier.

Smith drove the trio to the apartment in a BMW SUV.  Taylor's orange Kia Rio was already parked in front of the apartment building.  Taylor had earlier let defendant drive her car there.

The three knocked on the door, and Keela opened it.  Her left eye was black.  Smith had seen her black eye the day before when she came by his house.  The three went inside the apartment with Keela and they talked, ate food, drank alcohol, and used methamphetamine.

a.    Shayla Taylor

Taylor stated that when the trio arrived, defendant and Keela were not in an argument.  Keela warmed up little pizzas in the kitchen and fixed herself some spaghetti while Taylor stood by at the kitchen table.  Smith sat in a chair by the table.  At some point, Damphier sat at the table as well.  Defendant was asleep sitting up on one of the apartment's two couches.  A pot dropped on the floor and woke him up.

Keela came out of the kitchen with her spaghetti and sat on the couch. She fed defendant some of her food and then continued eating it herself. Taylor was standing at the kitchen table eating and talking with Smith and Damphier. (Both Taylor and Smith testified that Damphier was at the kitchen table when the shooting occurred.) Taylor testified there was never a time when Damphier sat in the living room where the couch was.

Defendant came into the kitchen. While he was standing, Taylor bent down to look for something. When she stood back up, she heard two shots. Defendant was behind Keela but closer to the couch directly across from where Taylor was standing. Keela was on the couch. No argument or altercation had led up to the shots. Defendant said nothing before the shots. Taylor did not see defendant shoot Keela, but she heard the shots and could tell they came from inside the apartment. Seconds after the shots, Taylor looked at defendant and watched him put a silver revolver inside a fanny pack he had clipped on him. She later told police that defendant put the gun in something like a small purse pouch.

Smith asked defendant if he was all right. Defendant shook his head yes and walked out. He did not check on Keela before he left. Taylor, Smith, and Damphier also walked out. Taylor called Keela's name before she left, but Keela did not respond or move. Smith called Keela's name twice but received no response.

Defendant left in Taylor's car. Taylor and Damphier joined Smith in his car. Taylor had intended to go to her car, but she didn't see it. After about five seconds inside Smith's car, Taylor got out to call 911. She made the report because Smith and Damphier had outstanding warrants on them. Taylor initially did not identify herself when she called 911. She lied to the officer who responded to the scene and told him she was visiting a family member in an upstairs apartment, and her family was about to come back and pick her up. She said she did not know who the person was, and she was worried about her own daughter. The only thing she had noticed about Keela's apartment

3

was that its door might have been cracked open.  Taylor lied because she was already on probation, and she did not want to have any part of the incident.

          b.       <u>Antoinette</u> <u>Damphier</u>

Damphier testified that when she, Taylor, and Smith went inside the apartment, everything seemed fine between defendant and Keela.  At one point, the two were "tripping" over Keela's phone, but things returned to normal.

About 15 or 20 minutes after the trio of friends arrived, defendant fell asleep on the couch.  He slept for another 15 or 20 minutes.  Smith and Taylor were at the kitchen table eating pizza.  Keela warmed up some spaghetti.  She shared some with Damphier and made a plate for defendant, and the two women sat on the couch eating and talking.  (Both Taylor and Smith testified that Damphier was at the kitchen table when the shooting occurred.)  Taylor testified there was never a time when Damphier sat in the living room where the couch was.

Defendant woke up.  He picked his plate of spaghetti up from the living room table, walked to the kitchen, and threw the plate in the sink.  He walked back and stood in the hallway with his hands in his hoodie sweater.  He said nothing; his demeanor was blank.  Then he shot Keela twice in the back of her head from a distance of no more than three feet.  Keela and Damphier were facing each other when Damphier heard the shots.  Everyone jumped from the shots coming out of nowhere, and it "was just in [Damphier's] view."  Keela raised her hands to her ears after the shots.  Damphier saw Keela exhale her last breath.

Damphier did not see a gun in defendant's hands and did not see him fire the actual shots.  She concluded defendant had shot Keela because he had been standing closest to her, and if he did not fire the shots, he would have been hit by the same bullets.  Damphier also concluded defendant was the shooter because of his "look" and "the look that was in his eyes."

4

Everyone was shocked and confused. Without saying anything, defendant opened the front door, and everyone left. While they were leaving, someone told defendant to "put that shit up," meaning put the gun away. Damphier left quickly because she was on parole and had a warrant out for her arrest, and she did not want to be the next victim. Defendant got into Taylor's car, and Damphier got into Smith's car with Taylor. Taylor got out of the car to call the police because Smith and Damphier had warrants. Smith and Damphier drove to a house belonging to another of Smith's girlfriends.

Damphier waited while Smith went inside the house, but after waiting "too long," she walked to her mother's house. About a week later, Damphier left town and ultimately ended up in jail in Orange County. Officers interviewed her about the shooting while she was there.

c.     LeAndrew Smith

Smith stated that defendant hung out with the trio and Keela before falling asleep on the couch. Keela was making food for everyone. Smith ate his food while sitting at the table. Taylor and Damphier were across from him. After cooking, Keela walked into the living room and sat down on the couch.

Defendant got up and came into the kitchen. Smith was on his phone texting another girl and did not know what defendant was doing. He then heard two shots. The shots sounded like they came from inside the apartment. Smith did not see a shooter or a gun. When he looked up, defendant was still standing in the kitchen facing towards the living room and Keela. He had not said anything before the shots.

Smith was shocked and felt "it was time to go." While leaving the apartment, he said goodbye to Keela by saying, "All right, K." He did not know at that moment that Keela had been shot. When he heard the shots, he thought someone was shooting in the air. Smith stated that neither he, Taylor, nor Damphier fired the shots. Asked if defendant fired the shots, Smith said he did not see him shoot or see a gun.

5

Defendant left the apartment first and drove off.  The other three followed and got into Smith's car.  After finding out what had happened, Smith told Taylor to go take care of Keela and call an ambulance because she did not have a warrant.  Smith dropped Damphier off at a school and then went to the house of the girl he had been texting.  At some point, Smith told Damphier to get rid of her social media.  He was concerned about being contacted by law enforcement because they had just left the scene of a crime, and he did not want anything to do with it even though he had been there.

d.    Tyra Cole

Tyra Cole, Keela's sister, lived in an apartment two doors down from Keela.  Tyra described Keela's relationship with defendant as "stupid" and "a mess" because "he was always cheating on her and she was always going through it."

A few days before the shooting, defendant met with Tyra in her apartment.  He asked to borrow a screwdriver, but he stayed for about an hour.  Tyra had seen Keela with a black eye the day before, and she and defendant talked about it.  He said Keela forced him to give her a black eye because she pushed him repeatedly and would not leave him alone.  She kept asking him where he was and what was going on.  Defendant told Kyra he had cheated on Keela.  He was upset with himself for hitting Keela, telling Tyra he did not hit women.

During their visit, defendant saw a purse sitting on Tyra's couch.  It was a small, hardshell purse with a strap and was black, brown, and white.  Defendant told Tyra he wanted the purse to put his gun in it, as it was "the perfect size."  Tyra had seen defendant before with a small, black gun that wasn't automatic and had what Tyra called a barrel she described by moving her finger in a circular motion.  She did not believe defendant had a gun with him while they talked.  Tyra gave defendant the purse.

On the night of the shooting, July 19, 2021, Tyra arrived home around 11:00 p.m.  She walked into Keela's apartment to borrow some relish.  Keela was in her room sitting

6

on the bed, and defendant was walking from her room holding things in his hand. Keela told him to pull up his pants because he was walking through the hallway. Tyra got the relish, went to her apartment, ate, and fell asleep in her bed.

### e.       Sara O.

In July 2021, Sara O. lived in an upstairs apartment directly above Keela's apartment. She was acquainted with Keela, as they saw each other every day. Sara believed defendant had been in Keela's apartment for less than a year.

Sara never saw defendant and Keela argue, but she heard them yelling and arguing a few times a week. Some of the arguments got intense. The fights leading up to the day of the shooting were "pretty volatile" and loud. The most volatile argument she heard was on the night before the shooting. At 1:40 a.m., July 20, 2021, Sara heard two gunshots. She also heard defendant and Keela arguing right before the gunshots.

### 2.       Law enforcement response and investigation

Shayla Taylor called 911 at 1:49 a.m. Deputy Sheriff Jeremiah Kim arrived at the apartment complex at 1:52 a.m. He placed Taylor in his patrol car, asked her some questions, and then went into Keela's apartment with other officers.

Inside the apartment, the officers saw Keela unresponsive and sitting back on the couch. Deputy Kim noticed a protrusion on her right eye and a small amount of blood coming out of her nose. He could not see any gunshot wounds at first. The officers did a protective sweep and saw no one else in the apartment. Two officers pulled Keela's body by her legs onto the floor to perform lifesaving measures. Keela remained unresponsive.

Taylor sat in the patrol car for four and a half hours. At approximately 4:35 a.m., she saw defendant walk by the car. He appeared to be in shock. He was wearing different clothes than what he wore when he left the apartment. He also was not wearing the bag in which he had put his gun after he shot Keela.

Deputies woke Tyra up around 4:00 a.m. by knocking on her door, and they informed her that Keela had lost her life. Tyra told the deputy about the purse she had given to defendant. She also informed the deputy she had a Ring security camera next to her front door, and she gave them access to the footage.

Defendant walked towards Tyra's apartment as Tyra was outside speaking with the officers. Tyra yelled, "There he goes right there!" The officers drew their guns and ordered defendant to the ground. As he was apprehended, defendant repeatedly asked, "What's going on?"

Video footage from Tyra's Ring camera depicted Tyra arriving at her apartment door just before 11:00 p.m. on July 19. At 11:22 p.m., Taylor, Damphier, and Smith walked past Tyra's apartment towards Keela's apartment. At approximately 11:53 p.m., defendant and Keela walked towards Tyra's door, and defendant knocked on it. Defendant was wearing the purse Tyra gave him. Tyra did not hear them because she was asleep by then. Keela appeared at Tyra's door again at 12:23 a.m., July 20, speaking on her phone. At 1:40 a.m., defendant walked past Tyra's door coming from the direction of Keela's apartment and carrying the purse Tyra had given him. Tayler, Damphier, and Smith followed him.

After having sat in the patrol car for over four hours, Taylor was taken to the sheriff's station and interviewed. That interview was the first time she told officers about what she had witnessed. She said two other people had been present in the apartment, but she lied and said she did not know their names. She did not give the officer their names because she knew they had warrants on them.

Taylor told the officer that after the shooting, defendant put the gun into a "purse-type case type thing . . . like a little purse pouch." It was not a fanny pack. It was more like a man's purse that had a long strap and could be worn. Taylor said the gun was black, and it wasn't big.

Taylor stated that when she arrived at the apartment that night, defendant yelled at Keela and was mad because she always had something to say. Taylor said defendant did not like a woman who had some sort of intelligence or something to say about a particular matter.

After the interview, an officer took Taylor back to the area around Keela's apartment to help her locate her Kia. They found the vehicle near the crime scene. Taylor asked the officer to search her car because defendant had taken it, and the gun could still be in it. Detectives arrived, and with Taylor's consent, they searched her car. On the front driver's seat, they saw the purse Taylor had seen defendant put the gun into after the shooting. Inside the purse, officers found a cigarette butt and a metal straw. The officers did not find a firearm in the purse or car.

Sheriff's detectives interviewed Damphier at the Orange County jail. Regarding Keela's murder, Damphier stated that defendant had a gun. She described the gun as "a .38 or something" revolver. It was "blackish brown" in color. Damphier saw defendant with a gun the night of the shooting, and she saw him pull the gun out. She did not remember what he did with the gun after he shot Keela. She saw it in defendant's hand, and then when they were near the door, someone told defendant "to put that shit up." She could have been the person who made that comment, but she wasn't sure.

### 3. Forensic evidence

An autopsy revealed that Keela was shot once in the top right backside of her head. The bullet fragmented, and the bulk of the projectile went into the cerebellum portion of Keela's brain. Smaller fragments exited the head and were deposited in Keela's hair. The gunshot wound caused Keela's death.

A criminalist determined that the bullet was a "nominal .38 caliber bullet." The term "nominal" refers strictly to the bullet diameter, as many different cartridges can have the same bullet diameter. The bullet most likely was fired from a revolver.

9

At the crime scene, officers had noticed a defect in the upper-top portion of the back of the couch on which Keela had been sitting when she was shot. The officers took off the couch's exterior fabric, and they found black hairs inside the defect. The hairs were consistent with Keela's hairs.

The officers dismantled the couch to try to locate evidence of the second shot, but they found no projectiles. However, it is not unusual to have difficulty finding a projectile in furniture or car seats even when there is an entry defect.

DNA testing of the strap of the purse found in Taylor's car and the metal straw found inside the purse revealed mixtures of DNA. Eighty-two percent of the DNA found on the purse strap and 77 percent of the DNA found on the metal straw were determined to a near-mathematical certainty to have been from defendant.

Criminalists detected gunshot residue in samples taken from inside the purse and from defendant's hands after he was apprehended. If a recently fired gun is placed inside a bag or container, criminalists under most circumstance would expect to find gunshot residue inside that bag or container. A criminalist detected 94 "candidate particles" in a sample taken from inside the purse. Twenty-three of those were characteristic of gunshot residue (they contained lead, barium, and antimony). No particles characteristic of gunshot reside were found on Taylor's hands. A criminalist detected five particles characteristic of gunshot residue from the sample taken from defendant's right hand and two such particles on his left hand. The presence of residue on defendant's hands indicated he had either fired a gun, was near a gun when it was fired, or touched a fired gun or fired ammunition.

4.    Stipulation

The parties stipulated that defendant had previously been convicted of a felony and therefore was prohibited from possessing a firearm.

10

B.    <u>Defense</u>

Defendant did not present any evidence.

C.    <u>Verdict</u> and <u>sentence</u>

A jury found defendant guilty of first degree murder and possession of a firearm by a felon.  (Pen. Code, §§ 187, subd. (a); 29800, subd. (a)(1).)  The jury found true an allegation on the murder count that defendant personally used and intentionally discharged a firearm causing death.  (Pen. Code, § 12022.53, subd. (d).)

The trial court denied defendant's motion for a new trial.  It found true nine aggravating factors the prosecution had pleaded.  The court sentenced defendant to a prison term of two years plus 50 years to life:  25 years to life on the murder count, 25 years to life for the associated firearm enhancement, and the middle term of two years on the possession count.

DISCUSSION

I

*Right to Present a Defense that Smith was the Perpetrator*

Evidence of a third party's culpability needs only to be capable of raising a reasonable doubt to be admissible.  (*People v. Hall* (1986) 41 Cal.3d 826, 833 (*Hall*).)  However, to raise a reasonable doubt, the evidence must establish more than mere motive or opportunity to commit the crime.  (*Ibid.*)  "[T]here must be direct or circumstantial evidence linking the third person to the actual perpetration of the crime."  (*Ibid.*)  Exculpatory evidence pointing to a third person is not admissible "if it 'simply affords a possible ground of possible suspicion . . . .' "  (*Id.* at p. 832.)

Defendant contends the trial court erred by precluding him from introducing evidence that LeAndrew Smith was the shooter.  Defendant argues the court erred when it precluded him from questioning Smith on cross-examination about his role as the

11

possible shooter, especially after the prosecutor had asked Smith on direct examination whether he shot Keela, and Smith had answered no. Defendant also claims the court erred by precluding him from arguing to the jury that Smith was the shooter. Defendant asserts the court's rulings violated his constitutional right to present a defense.

### A. Background

The prosecution and the defendant filed opposing in limine motions addressing evidence of third party culpability. The prosecution sought to exclude such evidence in the absence of direct or circumstantial evidence linking a third person to the crime. The prosecution stated that every percipient witness had identified defendant as the perpetrator, and the defense had not provided any discovery of direct or circumstantial evidence that another person was the shooter.

Defendant's in limine motion sought an order permitting him to introduce evidence that Smith was the shooter. In the written motion, defense counsel argued, "[Smith] was present at the scene of the shooting, issued directives to his two female companions after exiting the apartment, and left the scene to avoid contact with law enforcement officers. He was sought out as a person of interest by the investigation detectives. One week after the murder he was spotted in traffic. When a patrol car attempted to pull him over he fled, leading officers into a high speed pursuit which ended in a crash. This demonstrates a consciousness of guilt." Counsel argued that this circumstantial evidence provided a link between Smith and the commission of the crime, and any explanations Smith could give to explain his suspicious behavior went to the weight of the evidence.

It was uncontested that Smith possessed a firearm when police pursued him and that the shots that killed Keela did not come from that firearm. The trial court excluded evidence of Smith's arrest for possessing the firearm and, except for purposes of impeachment, his resulting conviction for violating Penal Code section 29800.

Before the trial court, defense counsel argued that Smith was present at the crime scene and brought two other witnesses with him. He left without reporting the crime and without waiting to talk with officers. Counsel asserted one could not link a person any more to a crime than showing he was present at the scene. "If he's there, that's a very strong link." Counsel argued the absence of any other forensic evidence or a weapon did not mean the third party culpability issue could not be raised in the context of raising a reasonable doubt.

Defense counsel argued that Smith's, Taylor's, and Damphier's actions were sufficiently suspicious to constitute circumstantial evidence of consciousness of guilt. As for Smith, he left the scene without saying anything other than giving instructions to Taylor and Damphier on how to handle themselves. He also tried to evade the police in his car at high speed when they tried to pull him over, resulting in a collision that injured his passenger.

The trial court granted the prosecution's motion to exclude evidence of third party culpability. It found no direct or circumstantial evidence linking Smith to the shooting. The court explained, "Flight is not enough. And the evidence, which I think all counsel agree, is such that the firearm that was found on Mr. Smith at the time of his arrest did not match the firearm that killed Ms. Cole. [¶] Even so -- there is no evidence of any motive. While there might be an opportunity because Mr. Smith was in the apartment at the time of the shooting, there has been no direct or circumstantial evidence to demonstrate Mr. Smith's motive or opportunity. [¶] So even assuming there was some sort of motive on the part of Mr. Smith, that and in of itself is not enough. Flight, the fact that he had a firearm on him, that Mr. Smith perhaps was not cooperative with law enforcement at the time of his arrest, I would characterize as tenuous and/or speculative, which our Supreme Court has held is insufficient to allow the defense to raise third party culpability. [¶] So exercising my discretion under Evidence Code Section 352, the Court will exclude any evidence of third party culpability."

13

Defense counsel stated he had evidence of motive that he wanted to put on the record. He was investigating whether Smith had motive because Keela knew of a crime he had committed. The trial court reiterated that motive and opportunity were not sufficient grounds to admit evidence of third party culpability. Counsel argued that with Smith's motive, his presence at the crime scene sufficiently linked Smith to committing the crime. The court retorted, "That's opportunity." It told counsel he could raise the issue again if he could produce evidence that established more than motive or opportunity.

Under direct examination at trial, Smith acknowledged he had told Damphier to get rid of her social media. He was concerned about being contacted by law enforcement because they had just left a crime scene. He wanted "nothing to do with it," even though he had been there. Asked why, Smith stated, "Because that's not what we're supposed to do. . . . [E]ven though shit happens, we're not supposed to have no police contact. It's just what it is. We're not supposed to do that. We're not supposed to do this. We're not supposed to talk right here. We're not supposed to do none of this." He was not supposed to testify because "that's how I was raised up, taught."

The prosecutor asked Smith why he was testifying if he was not supposed to. Smith responded, "I'm here because I was subpoenaed, one. Two, somebody to get the record straight that -- somebody trying to put -- I did a crime. I'm saying I did a crime, I'm doing my time for it. If you do a crime, do your time for it. Don't try to put it off on somebody else. Man up."

Smith had not wanted to testify at defendant's preliminary hearing, but he was subpoenaed. He ultimately testified at the hearing after receiving immunity for his use of methamphetamine on the night of the shooting. Smith was already in custody for another case when officers first talked with him about this case. He told the officers he did not want to talk with them unless they could do something for him. However, he did not receive any kind of consideration in the case for which he was already in custody.

14

The prosecutor asked Smith what made him change his mind from not wanting to talk with the police, leaving the scene because he had a warrant, and not wanting to testify at the preliminary hearing, to testifying now at trial. Smith said he still did not want to testify. The dialogue continued:

"[Smith:] But it's -- if I don't say anything, it's gonna get pushed off. It's not – it's not some – somebody's pushing it the other way towards me. I'm not trying to be in any of that. I'm not trying to be around it. I'm trying to be nothing -- nothing to do with this. But somebody's gonna tip it towards me. They do they own -- man.

"[Prosecutor:] Did you shoot Keela Cole?

"A Huh?

"Q Did you shoot Ms. Cole?

"A Did I who?

"Q Did you shoot Ms. Cole?

"A No. Never.

"Q Then why are you worried about that?

"A I just don't want no part of it, no."

At that point, defense counsel asked for a bench conference. A settled statement of the un-transcribed bench conference describes the discussion as follows:

"[D]efense counsel objected to the prosecutor's question and Mr. Smith's answer on the ground that they violated the trial court's order precluding evidence of third party culpability. Defense counsel argued that it was unfair for Mr. Smith to deny being the shooter while the defense was barred from challenging the denial.

"The prosecutor countered that her question and Mr. Smith's answer did not constitute third party culpability evidence. She argued that the question and answer properly rebutted the defense theory that Mr. Smith fabricated his testimony out of concern that he would be accused of the homicide.

"The trial court agreed with the prosecutor.

15

"Defense counsel then argued that the exchange between the prosecutor and Mr. Smith opened the door to third party culpability questions and evidence.

"The trial court disagreed and determined that defense counsel was conflating the issue of third party culpability with a motive to fabricate testimony.

"The bench conference concluded with the trial court stating that defense counsel's argument and objection lacked merit, that the door had not been opened to evidence of third party culpability, and that the original ruling remained intact."

While cross-examining Smith, defense counsel asked, "By somebody pushing this off on you, you're talking about me, his attorney, pointing the finger at you?" Smith responded, "Yeah. You have a job to represent your client by any means necessary. I know that. And whatever you -- whatever it is, you have to defend him no matter what."

During his closing argument, defense counsel told the jury that when it considered circumstantial evidence, it had to accept only reasonable conclusions and reject unreasonable conclusions. Counsel continued, "I suggest to you that it's not unreasonable to say that [gunshot residue] on [defendant's] hands could have come from him being on that couch near her when the gun was fired by someone else. [¶] I think you have a pretty good idea who I'm thinking about there."

The prosecutor objected, citing the motion in limine as support. The trial court sustained the objection.

Defense counsel also argued that Smith was "more than just a curiosity to me. And he admitted on the stand that from the minute he left this scene, he was concerned about being accused." The prosecutor objected, again citing the motion in limine as support, and the trial court sustained the objection. Defense counsel asserted that Smith's "whole presentation screams of putting this all on [defendant] because he's worried about being blamed." The prosecutor objected, but the trial court overruled the objection.

16

B.      Analysis

Whether derived from the due process clause of the Fourteenth Amendment or the compulsory process or confrontation clauses of the Sixth Amendment, the federal constitution "guarantees criminal defendants 'a meaningful opportunity to present a complete defense.' " (*Holmes v. South Carolina* (2006) 547 U.S. 319, 324.) Nonetheless, well established rules of evidence permit trial courts to exclude defense evidence if it is not relevant or if its probative value is outweighed by certain other factors, such as unfair prejudice, confusion of the issues, or the potential to mislead the jury. (*Id*. at p. 326; Evid. Code, §§ 350, 352.)

One application of this principle is found in rules that regulate the admission of evidence offered by criminal defendants to show that someone else committed the charged offense. (*Holmes v. South Carolina, supra*, 547 U.S. at p. 327.)  Under the rules of evidence, courts generally treat third party culpability evidence like any other evidence.  "Evidence that raises a reasonable doubt as to a defendant's guilt, including evidence tending to show that another person committed the crime, is relevant.  But evidence that another person had a motive or opportunity to commit the crime, without more, is irrelevant because it does not raise a reasonable doubt about a defendant's guilt; to be relevant, the evidence must link this third person to the actual commission of the crime." (*People v. Brady* (2010) 50 Cal.4th 547, 558.)  To raise a reasonable doubt, the evidence must establish more than mere motive or opportunity to commit the crime. Direct or circumstantial evidence must link the third party to the actual perpetration of the offense. (*Hall, supra*, 41 Cal.3d at p. 833.)

The rule limiting third party culpability evidence to direct or circumstantial evidence that links the third person to the commission of the crime does not violate a defendant's right to present a defense. (*People v. Prince* (2007) 40 Cal.4th 1179, 1242-1243; *Hall, supra*, 41 Cal.3d at pp. 834-835.)  We review a trial court's ruling on the

admissibility of third party culpability evidence for abuse of discretion. (*People v. Brady, supra*, 50 Cal.4th at p. 558.)

Defendant states he is not challenging the trial court's ruling on the in limine motion because, in his opinion, the court prohibited him only from introducing the evidence he proffered for admission at the time: evidence that Smith was involved in a car crash unrelated to Keela's death and that he disposed of a firearm not used in Keela's shooting. Defendant now agrees that this evidence was too tenuous to meet the requirements for admission as third party culpability evidence.

Defendant instead contends the evidence he sought to obtain from cross-examining Smith was not third party culpability evidence. Smith was a percipient witness. Defendant wanted to question Smith about his role in the shooting, which defendant argues was as much a part of Smith's percipient observations as anything Smith observed the others do.

Even if questioning Smith fell within the scope of third party culpability evidence, defendant argues this was a unique case that compelled allowing the questioning. Defendant and Smith were the only two people who could have shot Keela. (No one contended Taylor or Damphier was the shooter.) For defendant to pursue his defense that he was factually innocent, it followed that Smith must have been the shooter. Defendant claims one cannot divorce Smith's role as the shooter from defendant's claim of innocence. He argues that given Smith's presence at the scene and the inversely proportional relationship between defendant's guilt and Smith's guilt, the trial court's proscription against questioning Smith about his role as the shooter violated defendant's right to present a defense.

Defendant's description of the trial court's consideration of the in limine motions is incomplete. He ignores that not only did the court deny his request to admit evidence of Smith's apprehension and possession of a firearm, but it also granted the prosecution's motion to preclude all third party culpability evidence, ruling it would exclude "any

18

evidence of third-party culpability." Thus, without direct or circumstantial evidence linking Smith to perpetuating the offense, defendant could not argue that Smith was the perpetrator, and that prohibition raised no constitutional violation. (See *People v. Prince, supra*, 40 Cal.4th at pp. 1242-1243.)

Defendant asserts he sought to question Smith about his role in the shooting only as a percipient witness and because his defense of innocence depended on Smith being the shooter. But these points make no difference. To question Smith on whether he was the perpetrator, defendant was required to offer direct or circumstantial evidence linking Smith to the commission of the crime, percipient witness or not. Claiming Smith was a percipient witness meant only he had an opportunity to commit the crime, and opportunity alone is not enough to raise a third party culpability defense.

Defendant's claim that the trial court erred because his defense depended on Smith being the actual shooter is belied by the defenses he pursued. Defendant's theory at trial was that Smith fabricated his testimony because he did not want to be accused of the crime. Defendant also argued that Smith, Taylor, and Damphier conspired to frame him for the crime and fabricated and coordinated their testimony accordingly. Defendant was able to pursue these theories to create reasonable doubt without having to expressly argue that Smith was the culprit. The trial court thus did not deny him his right to present a defense.

Defendant contends that even if the trial court's ruling on third party culpability evidence was correct, the trial court erroneously prohibited cross-examination on Smith's role after the prosecutor opened the door to such questioning by asking Smith whether he shot Keela. Defendant argues that questioning of a witness that is designed to elicit otherwise inadmissible information may be allowed if the other side opened the door to such information by eliciting contrary evidence, especially when the witness makes an unequivocal or sweeping assertion on direct examination. Defendant asserts that regardless of the prosecutor's purpose for asking the question, she asked it, and Smith

19

answered with an unequivocal denial. Defendant should have been allowed to question that denial. By prohibiting defendant from cross-examining Smith on that point, the trial court let Smith's assertion go unchallenged and untested. Defendant contends it was constitutional error to preclude counsel from cross-examining Smith on this topic.

Cross-examination is limited to the scope of direct examination. (Evid. Code, § 773.) A cross-examiner " 'may bring out all the facts within the knowledge of a witness involving things testified to on direct and which are material to a thorough understanding of the testimony, or to elicit any matter which may tend to overcome, qualify or explain the direct testimony.' [Citation.] Cross-examination has for its first utility the extraction of such remaining and qualifying circumstances." (*Eddy v. Gallaway* (1970) 11 Cal.App.3d 185, 192.)

Nonetheless, a trial court has a " 'wide latitude' of discretion to restrict cross-examination and may impose reasonable limits on the introduction of such evidence." (*People v. Smith* (2007) 40 Cal.4th 483, 513.) The court has discretion to limit cross-examination to "those matters properly relevant and admissible." (*People v. Schwartzman* (1968) 266 Cal.App.2d 870, 890.)

It is a "popular fallacy" that testimony given on a subject on direct examination will open the door or "open the gates" to unrestricted cross-examination about that matter and make evidence admissible that would otherwise be inadmissible. (*People v. Matlock* (1970) 11 Cal.App.3d 453, 461; *People v. McDaniel* (1943) 59 Cal.App.2d 672, 677.) For example, in *Buchanan v. Nye* (1954) 128 Cal.App.2d 582, plaintiff's counsel, a lay witness, testified he did not wish to call an eyewitness to a car accident to testify. On cross-examination and over objection, he stated he did not want to call the eyewitness because he could not vouch for him, partly because of a statement the witness had made to the police which was contained in the police report. Continuing on cross-examination, defense counsel, who had wanted to call the eyewitness to testify but had not found him, read the eyewitness's statement into the record in the form of a question. (*Id.* at pp. 584-

20

585.)  The Court of Appeal held that cross-examination could not be used to introduce inadmissible evidence, in this case the eyewitness's hearsay statement which was not subject to an exception to the hearsay rule.  (*Id*. at pp. 585-586.)  Although the *Buchanan* court did not use the phrase, it effectively held that the plaintiff's witness had not opened the door for admitting the eyewitness's inadmissible testimony through his own testimony.  (See Cal. Trial Objections (Cont.Ed.Bar 2025) § 26.5.)

So it is here.  The prosecutor's question to Smith of whether he had shot Keela did not open the door for defendant to introduce inadmissible third party culpability testimony.  The trial court had ruled that defendant could not introduce evidence that Smith was the shooter until defendant had evidence that linked Smith to the shooting beyond merely having a motive or opportunity.  Without such evidence, defendant was still barred from questioning Smith on being the shooter.  The prosecutor's question did not make inadmissible evidence suddenly admissible.

An exception to this rule exists when a witness's testimony opens the door to be impeached by evidence that is not otherwise admissible.  "[A] witness who makes a sweeping statement on direct or cross-examination may open the door to use of otherwise inadmissible evidence of prior misconduct for the purpose of contradicting such testimony."  (*Andrews v. City and County of San Francisco* (1988) 205 Cal.App.3d 938, 946.)

Defendant's cited authorities fall into this exception.  In *People v. Senior* (1992) 3 Cal.App.4th 765, the defendant on direct examination categorically denied ever making threats.  (*Id*. at p. 778.)  The court ruled he could be impeached with evidence he had made a threat before.  (*Id*. at pp. 778-779.)  In *People v. Reyes* (1976) 62 Cal.App.3d 53, the defendant on direct examination denied ever engaging in bookmaking.  (*Id*. at p. 60.)  The court held he was subject to impeachment by use of an otherwise inadmissible prior misdemeanor conviction for bookmaking.  (*Id*. at pp. 61-62.)  And in *People v. Cooks* (1983) 141 Cal.App.3d 224, the defendant denied ever possessing a gun.  (*Id*. at p. 324.)

21

The court ruled it was proper to impeach his testimony with evidence he had once pleaded guilty to a stolen gun charge. (*Ibid.*)

These authorities do not apply here. Defense counsel sought to obtain inadmissible evidence from Smith, not to impeach him. Indeed, counsel had no *evidence* with which to impeach Smith's testimony that he did not shoot Keela. Otherwise, counsel could have challenged Smith's denial of shooting Keela. Counsel had only speculation based solely on opportunity and motive regarding Smith's denial. Without such evidence, counsel was precluded from seeking to introduce any third party culpability evidence even from Smith, the prosecutor's question notwithstanding. The trial court's ruling prohibiting defendant from questioning Smith about his potential culpability was not an abuse of discretion.

Defendant also contends the trial court erred by not allowing defense counsel to argue that Smith was the shooter in his closing argument. Defendant argues the trial court, in sustaining the prosecution's objections to defense counsel's arguments, improperly conflated factual assertions with reasonable inferences based on facts adduced at trial. Defendant asserts that when counsel was attempting to "point the finger" at Smith during closing argument, he was not pursuing a third party culpability defense because he was not seeking to introduce evidence. Instead, he was asking the jury to draw the conclusion that Smith was the shooter based on the evidence presented.

A trial court has "a duty and right" to preclude defense counsel from making an argument that is not supported by substantial evidence. (*People v. Ponce* (1996) 44 Cal.App.4th 1380, 1390.) Because there was no substantial evidence that Smith was the shooter, the trial court did not err in precluding defendant from arguing that Smith was the shooter.

Even if the trial court erred in not allowing defendant to cross-examine Smith as the shooter or to make that argument, we would find the error harmless. Assuming only for purposes of argument that defendant was denied the opportunity to present a defense,

22

we look to determine whether the error was harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 24.)  We conclude it was.  All the evidence that would have potentially linked Smith to the shooting was placed before the jury, and counsel thoroughly cross-examined Smith based on that evidence.  It is unreasonable to believe or speculate that Smith would have provided new evidence which had not already been introduced or provided through discovery that would have led the jury to decide differently.

Taylor, Damphier, and Smith were inside Keela's apartment when the shooting occurred, and although none of them saw the shooting, each had no doubt that defendant was the shooter.  After the shooting, Taylor saw that Damphier and Smith were still seated at the kitchen table.  Seconds after hearing the shots, Taylor saw defendant put a revolver into a "fanny pack," which she described to officers as a "man's purse" with a "long strap."  Taylor also told police that defendant and Keela had argued before the shooting.

Damphier saw defendant standing right behind Keela when the two shots were fired.  Damphier said defendant shot Keela because he was standing closest to her and right behind her, and if he didn't do it, he would have been shot by the same bullets.  She heard someone tell defendant to "put that shit up" before defendant left the apartment, which meant to put the gun away.  Damphier told officers she knew defendant had a revolver; she saw him pull it out on the night of the shooting and saw it in his hand after the shooting.

After hearing the gunshots, Smith looked up and saw defendant standing in the kitchen facing towards where Keela was seated.  Taylor and Damphier were still seated at the kitchen table with Smith.  Although he did not see defendant fire a gun, he knew that neither he, Taylor, nor Damphier had fired a gun.

Keela had a black eye at the time she was shot, an injury that defendant had admitted to Tyra he had inflicted after Keela confronted him about his infidelity.  The jury

23

was instructed pursuant to CALCRIM No. 852A that if it found beyond a reasonable doubt that defendant had intentionally given Keela a black eye, it could conclude he was disposed to commit domestic violence offenses and that he was likely to have murdered Keela.  The jury likely made this finding.

Tyra had seen defendant with a small revolver.  A few days before the shooting, defendant asked Tyra if he could have her purse so he could keep his gun in it.  Video footage from Tyra's doorbell camera showed defendant wearing the purse around his neck about two hours before the shooting and as defendant walked away from Keela's apartment after the shooting.  Seconds after the shots, Taylor had watched defendant put a silver revolver inside the purse.

Sara O., who lived in the apartment directly above Keela's, heard defendant and Keela argue a few times a week.  The fights leading up to the shooting were volatile and loud.  She heard the couple's most volatile argument the night before the shooting.  She also heard defendant and Keela argue right before she heard the gunshots that killed Keela.

Defendant drove off in Taylor's Kia.  When he returned to the apartment complex a few hours later, he had changed clothes and no longer had the purse on his person.  Officers found the purse on the Kia's front seat, but no gun was inside.  The jury was instructed with CALCRIM No. 371 that if it found defendant had tried to suppress evidence, that conduct could show he was conscious of his guilt.  The jury reasonably could have determined that defendant removed his gun from the purse to hide it.

The forensic evidence further attested to defendant's guilt.  The bullet recovered from Keela's brain indicated it had most likely been fired from a revolver.  Defendant's DNA was found on the strap of the purse recovered from the Kia and on the metal straw found inside the purse.  Gunshot residue particles were found inside the purse.  Testing revealed gunshot residue particles on both of defendant's hands.  This indicated that

24

defendant had either fired a gun, was near a gun when it was fired, or had touched a fired gun or fired ammunition.

This evidence was sufficient for a jury to find beyond a reasonable doubt that defendant shot Keela, even if defendant had been able to question Smith on cross-examination about shooting Keela. Thus, any error by the trial court not allowing defendant to cross-examine Smith on his role as the shooter and to argue Smith was the shooter was harmless beyond a reasonable doubt.

## II

### *Motion for Mistrial Based on Prosecutor's Argument*

Defendant moved for a mistrial after the prosecutor in her closing argument, while rebutting defendant's theory that Smith, Taylor, and Damphier conspired to frame defendant, stated that defense counsel had every opportunity to ask any question he wanted of the three witnesses, but he didn't. Defendant contends the prosecutor committed misconduct, and the trial court abused its discretion when it denied his motion.

### A. Background

During his closing argument, defense counsel stated, "So this person, [Smith], is more than just a curiosity to me. And he admitted on the stand that from the minute he left this scene, he was concerned about being accused." The prosecutor objected, citing the "[m]otion in limine." The trial court sustained the objection. Counsel asked to approach, but the court directed him to proceed with his argument.

Defense counsel argued that Smith's "whole presentation screams of putting this all on [defendant] because he's worried about being blamed." The prosecutor objected based on the motion in limine. The trial court overruled the objection, but it directed defense counsel to "[s]tick to the evidence." Counsel then argued to the jury that Smith, Taylor, and Damphier, when they were in Smith's car after the shooting, conspired to

25

falsely accuse defendant. Counsel asserted that Smith was "the architect" of the conspiracy. The prosecutor objected based on the motion in limine, and the trial court "[g]ranted" the objection. But counsel continued stating without objection, "[Smith] is the architect of the story to fabricate against [defendant]."

On rebuttal, the prosecutor criticized defense counsel's theory of a conspiracy to fabricate evidence. She explained how the evidence supported the witnesses' testimonies. Her argument continued as follows:

"[MS. GRIMES (the prosecutor):] But you know what's really great about the criminal justice system? It's one of the wonderful things that we have as citizens. It's the right to confront and cross-examine our accusers. Mr. Renwick [defense counsel] – the defendant through his attorney, Mr. Renwick, had every opportunity to ask any question he wanted to of these three witnesses.

"All the things that he's asking you to speculate about what they were thinking, about the fact that they concocted a plan, he had every opportunity to ask them, Did you do that?

"MR. RENWICK: Objection, Your Honor.

"THE COURT: Overruled.

"MR. RENWICK: Your Honor, please can we --

"THE COURT: Overruled.

"MS. GRIMES: But he didn't. And now he's asking you to fill in evidence that is not in this courtroom. He's asking you to speculate. He's asking you to come up with conjecture because he didn't want the answers that came from them on the stand when they were being real about what they experienced about – about this whole scenario that the defendant was the one who put them in it."

After the prosecutor had concluded her rebuttal and the court had excused the jury, defense counsel moved for a mistrial. Counsel argued as follows:

"During the course of the trial when [the prosecutor] was asking questions that I thought stepped on your order in limine on third party culpability, we approached the bench and I told you that I thought this -- her line of questioning was opening that door.

"You disagreed.

"During my argument I never accused. All of my comments were framed within his motive as to accuse [defendant], followed up by his testimony, conceived in that vehicle. Yet you sustained two or three of [the prosecutor's] objections, which it'll be -- it's all on the record. It'll be decided some other time.

"But you sustained my -- her objections and then overruled mine on the same points. And I think if you -- when you look at the record, the transcript of these comments that I made, objections sustained, and the ones that she made, my objection is overruled. They're not different issues. [The prosecutor] -- and it is so prejudicial, because she brings up that I didn't ask questions, which you and I both know had to do with third-party culpability. I couldn't ask those questions. And [the prosecutor] just said I didn't ask Taylor. I didn't ask Damphier.

"I couldn't. My hands were tied.

"And when I objected to that, it was overruled and [the prosecutor] just rolled on through.

"Now, here's what it does to the defense case, Your Honor. It gives the jury the impression that I have this theory that their testimony is fabricated based on a story that they cooked up, but I look disingenuous because I didn't ask them the direct questions on whether or not they were culpable. Don't you see how it -- and yet she's suggesting that I could have.

"That's it. I'm really not going to say any more about it."

The prosecutor responded: "The People's objections during the defendant's closing argument were specifically targeted at when he accused Mr. Smith of committing the murder. There was, in fact, one objection where I thought it got close to that, but the

27

Court overruled it, and it was because I believe of what Mr. Smith's indication of what his motive for why he was testifying without immunity or why he was now testifying when he previously stopped.

"But Mr. Renwick even said to this jury, I have questions about Mr. Smith and he even said he thought he was the one responsible for the murder.

"It was those limited arguments that I made objections to.

"Mr. Renwick then changed how he was arguing the case, in the People's view, to then indicate that they concocted a story, that they had this timeline of events to come up with a story to fabricate, that they got together. Mr. Smith was the leader, that he got them all to come up with this story based on, in the People's view, no evidence that was presented in this record.

"And that was my argument, that Mr. Renwick did not ask them about concocting the story, that he never cross-examined them. And that is something for the jury to consider."

The court denied the motion for a mistrial. It explained its ruling as follows:

"I think the defense is conflating two different issues.

"One is the Court's ruling with respect to third party culpability. And I agree with the People that your closing arguments came very close to the line. And that is the reason why the Court sustained some of the objections by the People because you came very close. You didn't cross it, but you came this close to trying to infer third-party culpability despite the Court's ruling on the motions in limine. That's why I sustained the objections.

"With respect to your defense theory that these witnesses concocted the story to pin it all on [defendant], fair game. I don't think the People disagree with it. I don't disagree with it. And the People's argument in their closing had to do with your ability to question these witnesses further about their opportunity to concoct the story in the car, as you posited the scenario to the jury.

28

"So you, yourself, are conflating two different issues. That's the reason why the Court overruled your objection because Ms. Grimes was commenting on your argument about the ability and the credibility of these witnesses and your theory that they made this all up to frame [defendant].

"Fair game.

"And it's fair game for the prosecution to say you had the ability, through your cross-examination of these witnesses, to develop that theory if, in fact, that's your theory. There's nothing wrong with that. There's no Griffin error. There is nothing here.

"That is the reason why the Court is denying your motion for a mistrial."

B.      Analysis

Defendant contends the trial court abused its discretion in denying his motion for mistrial. He asserts the prosecutor committed misconduct by knowingly arguing a false inference to the jury when she knew the opposite was true and when she was responsible for the jury's ignorance of the available evidence that contradicted her false inference.

Defendant argues that, contrary to the prosecutor's rebuttal argument, defense counsel did not have "every opportunity to ask any question he wanted" due to the trial court's in limine ruling that excluded third party culpability evidence. Counsel could not have asked the witnesses about their conspiring to frame defendant for the murder without also asking them about Smith being the shooter, given that any conspiracy to frame defendant was necessarily one designed to cover up the fact that Smith was the actual shooter. Defendant asserts that any question he would have asked the witnesses about concocting a story to frame defendant would have thus run afoul of the court's in limine ruling against third party culpability evidence. The prosecutor took unfair advantage of the trial court's ruling by asserting that defense counsel had every opportunity to ask the witnesses if they did "that" when she knew he couldn't ask the question without violating the court's ruling against third party culpability evidence.

29

Generally, a motion for mistrial is granted only when a party's chances of receiving a fair trial have been irreparably damaged. (*People v. Bell* (2019) 7 Cal.5th 70, 121.) A trial court should declare a mistrial " 'only " 'if the court is apprised of prejudice that it judges incurable by admonition or instruction.' " [Citation.] "In making this assessment of incurable prejudice, a trial court has considerable discretion." ' " (*Ibid*.) We review a ruling on a mistrial motion for abuse of discretion. (*Ibid*.)

A mistrial may be granted because of misconduct committed by the prosecutor. (See *People v. Ayala* (2000) 23 Cal.4th 225, 283-284.) " 'A prosecutor who uses deceptive or reprehensible methods to persuade the jury commits misconduct, and such actions require reversal under the federal Constitution when they infect the trial with such " 'unfairness as to make the resulting conviction a denial of due process.' " ' (*Darden v. Wainwright* (1986) 477 U.S. 168, 181 []; see *People v. Cash* (2002) 28 Cal.4th 703, 733 [].) 'Under state law, a prosecutor who uses such methods commits misconduct even when those actions do not result in a fundamentally unfair trial.' . . . When a claim of misconduct is based on the prosecutor's comments before the jury, ' "the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion." ' " (*People v. Friend* (2009) 47 Cal.4th 1, 29.)

A prosecutor is given wide latitude in its argument to the jury. (*People v. Stanley* (2006) 39 Cal.4th 913, 951.) " ' " 'The argument may be vigorous as long as it amounts to fair comment on the evidence, which can include reasonable inferences, or deductions to be drawn therefrom.' " ' " (*Ibid*.) However, a prosecutor may not mislead a jury by asking jurors to draw an inference that they might not have drawn if they had heard evidence that the judge excluded. (*People v. Daggett* (1990) 225 Cal.App.3d 751, 758.)

The trial court did not abuse its discretion denying the motion for mistrial. Under the circumstances, there is not a reasonable likelihood the jury construed the prosecutor's comments in an objectionable fashion or drew an unwarranted inference. The prosecutor

had argued how the evidence did not support defendant's argument that the three witnesses had concocted a plan to fabricate evidence when in fact the evidence supported their testimonies. It was in this context that she stated defense counsel "had every opportunity to ask any question he wanted to" of the witnesses, and concerning whether they concocted a plan, counsel "had every opportunity to ask them, Did [sic]you do that?" Since the in limine ruling did not prohibit defendant from questioning witnesses about formulating a plan to fabricate evidence, the prosecutor did not unfairly take advantage of that ruling.

Contrary to his argument, defense counsel could have asked the three witnesses about conspiring to frame defendant without also questioning them about Smith being the shooter. Counsel could have asked questions regarding when, where, and how the witnesses agreed to concoct and implement a fabrication without also asking them why. But defense counsel did not ask those questions in support of his conspiracy theory. A prosecutor may argue to a jury that the defendant did not bring forth evidence to corroborate an essential part of his defense where a defendant might reasonably be expected to produce such corroboration. (*People v. Varona* (1983) 143 Cal.App.3d 566, 570.)

Defendant's reliance on *People v. Daggett, supra*, 225 Cal.App.3d at pages 757-758; *People v. Varona, supra*, 143 Cal.App.3d at pages 569-570; and *People v. Castain* (1981) 122 Cal.App.3d 138, 144-146, for his claim of misconduct is misplaced. In those cases, the prosecutors committed misconduct by asking jurors to draw an inference which they might not have drawn had they heard evidence which the trial court had *erroneously* excluded. (*People v. Lawley* (2002) 27 Cal.4th 102, 156.) By contrast, the prosecutor here asked the jurors to draw an inference based on a lack of evidence which the defendant had had an opportunity to introduce on cross-examination but did not.

Even if we agreed with defendant that the prosecutor was asking the jury to infer Smith was not the shooter because defendant introduced no evidence that he was—a

31

point we do not concede—the prosecutor in this instance still would not have committed misconduct. "[I]t is not misconduct for the prosecutor to argue in closing that there was no evidence supporting a particular proposition after the trial court has *properly* excluded evidence the defense had sought to introduce on that point." (*People v. Peterson* (2020) 10 Cal.5th 409, 465, italics added; *People v. Lawley, supra*, 27 Cal.4th at p. 156; but see *People v. Castaneda-Prado* (2023) 94 Cal.App.5th 1260, 1294 [prosecutors should not assert there is no evidence on a certain point when they know such evidence exists but was excluded by the court correctly or incorrectly].) We have already concluded the trial court did not err in excluding evidence of Smith's third party culpability. Nothing in the record suggests the prosecutor knew of evidence that Smith was the shooter and she thus did not commit misconduct by her comment.

Because the prosecutor did not commit misconduct, the trial court did not abuse its discretion in denying defendant's motion for mistrial.

III

*Motion for Mistrial Based on Evidence of Defendant's Infidelity*

Defendant contends the trial court abused its discretion when it denied his motion for mistrial based on Tyra Coles' testimony that defendant had been unfaithful to Keela. He argues the evidence was inadmissible under Evidence Code sections 352 and 1011, subdivision (b), because it lacked probative value, and the negative connotation engendered by the testimony created incurable prejudice.

A.     Background

In an in limine motion, defendant moved to exclude testimony from three witnesses concerning his prior infidelity. The prosecutor stated she was not going to call two of the witnesses, and she doubted whether the third would testify. Based on the prosecutor's statements, the trial court did not rule on the admissibility of evidence of defendant's infidelity.

At trial, Keela's sister, Tyra, testified that for about a year prior to Keela's death, Keela was in an "off and on" romantic relationship with defendant. Asked to describe their relationship, Tyra answered, "Stupid." Asked why, Tyra stated, "Because – I mean, he – he was always cheating on her and she was always going through it. Just, it was – it was a mess."

Defense counsel asked to approach the bench, and after a sidebar discussion, the court cleared the courtroom. Counsel then moved for a mistrial based on Tyra's statement. Counsel argued that Tyra's statement was not based on personal knowledge but on hearsay. The testimony was highly prejudicial and "devastating" to the case, and a limiting instruction could not undo the damage. Counsel also argued that the testimony violated the court's earlier ruling on defendant's in limine motion, whether Tyra intentionally violated the court's ruling or the prosecutor failed to adequately advise her not to mention cheating.

The prosecutor disagreed with defense counsel's characterization of the motions in limine. She understood the court's ruling not to be the witnesses could not talk about cheating, but rather evidence of cheating could be relevant, but it would have to be admitted in an appropriate way by an appropriate witness. The prosecutor had instructed the witness she could discuss only what the defendant had told her.

The trial court agreed with defense counsel that unless Tyra had personal knowledge of defendant's cheating, she was not competent to testify of defendant's affairs. However, the court did not believe the comment rose to the level of a mistrial. The court would admonish the jury to disregard the testimony, and it would admonish Tyra on the parameters of her testimony.

As the court admonished Tyra, Tyra revealed that defendant had told her about his affairs. Defense counsel continued to argue that her testimony should be stricken. The trial court ruled that the prosecutor could ask Tyra how she knew defendant was having an affair, but nothing more.

33

Before the jury, the prosecutor asked Tyra how she knew defendant had cheated on Keela. Tyra answered, "Because he told me." Tyra explained defendant had told her a few days before the killing at her home while they were discussing how Keela got a black eye.

B.      Analysis

Evidence that defendant committed an uncharged act is admissible to prove a material fact other than propensity, such as intent or motive. (Evid. Code, § 1101, subd. (b).) "The admissibility of such evidence depends on (1) the materiality of the facts to be proved; (2) the tendency of the evidence to prove those facts; and (3) the existence of a rule or policy, such as that of Evidence Code section 352, requiring exclusion of the evidence. (*People v. Kelly* [(2007)] 42 Cal.4th [763,] 783.) 'Because substantial prejudice is inherent in the case of uncharged offenses, such evidence is admissible only if it has substantial probative value. [Citation.] This determination lies within the discretion of the trial court.' " (*People v. Sanchez* (2016) 63 Cal.4th 411, 452-453.)

Defendant concedes that if Tyra's testimony was admissible, then the trial court did not abuse its discretion denying his motion for mistrial. However, he argues the testimony was inadmissible under Evidence Code sections 352 and 1101, subdivision (b), because it lacked probative value in proving a disputed issue of fact. He claims the only possible basis for admitting his infidelity under section 1101, subdivision (b), was to show a motive for wanting to kill Keela. He asserts, though, that the probative link between his infidelity and his motive "was minimal if not non-existent."

The trial court did not abuse its discretion in determining that Tyra's statement was probative and not prejudicial under Evidence Code section 352 and thus denying the motion for mistrial. Evidence of infidelity has long been admissible to establish motive. "Evidence of an accused spouse's intimate relations with others is relevant to the state of his or her marital relationship with the victim spouse and, therefore, to motive." (*People*

34

*v. Houston* (2005) 130 Cal.App.4th 279, 307 (*Houston*), citing *People v. Gosden* (1936) 6 Cal.2d 14, 25 (*Gosden*) [" '[n]o rule is more firmly established than that, upon the trial for murder of husband or wife, evidence tending to show illicit relations of the accused with another is admissible to show lack of love [or] affection for the defendant's lawful spouse' "]; and *People v. Brown* (1955) 131 Cal.App.2d 643, 661 (*Brown*) [evidence of relations with other women was relevant to a defendant's motive to engage in a conspiracy to murder his wife].)

The evidence was probative as it went to defendant's motive. The jury could reasonably infer that Keela's frustration with defendant's infidelity led to defendant hitting her in the eye and ultimately killing her. Keela's upstairs neighbor, Sara O., heard arguments from Keela's apartment a few times a week. The most volatile argument occurred on the night of July 19, 2021. Sara heard a final argument in the early hours of July 20, 2021, right before she heard two gunshots.

Defendant admitted to Tyra the weekend before the shooting that he gave Keela her black eye. He told Tyra that Keela "forced" him to give her a black eye because she was pushing him and asking him what was going on. It was in this context that defendant also told Tyra that he had cheated on Keela. The jury could infer that defendant's infidelity led to the confrontation that resulted in Keela's black eye as well as the other confrontations Sara O. overheard.

The trial court instructed the jury pursuant to CALCRIM No. 852A that if it found beyond a reasonable doubt that defendant punched Keela and gave her a black eye, it could conclude that defendant was disposed to commit domestic violence offenses and, based on that decision, also conclude that he was likely to commit and did commit Keela's murder. From this instruction and the evidence, the jury could reasonably infer that Keela's frustration with defendant's infidelity was the motive for the black eye and, later, the motive for defendant shooting her. The evidence of defendant's infidelity was highly probative.

35

Defendant's arguments to the contrary are not persuasive. He argues the evidence of infidelity found admissible in *Houston*, *Gosden*, and *Brown* was probative based on facts that do not exist in this case. In *Houston*, the husband murdered his wife after she had filed for divorce and had requested the husband transfer his interest in the couple's residence to her so she could refinance the loan and pay husband for his interest. (*Houston, supra*, 130 Cal.App.4th at pp. 286-287.) Evidence of the husband's infidelity was admissible to show motive, to test the credibility of the husband's testimony, and to explain latent fingerprints in the house. (*Id*. at p. 307.)

In *Gosden*, the husband murdered his wife to collect on life insurance policies, and the evidence of infidelity established a motive for the husband to kill his wife so he could marry another woman. (*Gosden, supra*, 6 Cal.2d at p. 26.) In *Brown*, the husband conspired to murder his wife to acquire real and personal property that was in her name, and the evidence of infidelity was relevant to show the husband's bad relationship with his wife, which went to motive. (*Brown, supra*, 131 Cal.App.2d at pp. 661-662.)

Defendant asserts that compared to these reported cases, the evidence of infidelity in this case is minimally probative, and thus its value is substantially outweighed by its risk of prejudice. He argues that unlike in *Gosden* and *Brown*, there was no evidence he stood to gain financially from killing Keela or that he was interested in starting a relationship with another woman that could come to fruition only if Keela first was dead. Also, defendant was not married to Keela, so there were no marital assets for him to inherit upon her death and nothing to stop him from leaving her for someone else. In addition, unlike in *Houston*, defendant did not testify or offer evidence that could be impeached for his credibility, nor did his infidelity explain any physical evidence.

Comparing this case to *Houston*, *Gosden*, and *Brown* does not help us determine the evidence's probative value. Each case is determined on its facts. "The weighing process under [Evidence Code] section 352 depends upon the trial court's consideration of the unique facts and issues of each case, rather than upon the mechanical application of

36

automatic rules. [Citations.] We will not overturn or disturb a trial court's exercise of its discretion under section 352 in the absence of manifest abuse, upon a finding that its decision was palpably arbitrary, capricious and patently absurd." (*People v. Jennings* (2000) 81 Cal.App.4th 1301, 1314.) The trial court's decision denying the motion for mistrial was not arbitrary, capricious, or absurd.

Defendant's reliance on *Winfred D. v. Michelin North America, Inc.* (2008) 165 Cal.App.4th 1011 (*Winfred D.*), to show the danger of prejudice that can result from the admission of otherwise irrelevant infidelity evidence is also unavailing. The plaintiff in that personal injury action transported produce to Las Vegas in a rented cargo van. The van's right tire delaminated, causing the van to roll over severely injuring the plaintiff. (*Id.* at pp. 1014, 1015-1016.) The plaintiff sued the tire's manufacturer for negligence and strict products liability. (*Id.* at pp. 1014-1015.) The manufacturer argued the accident was caused by the plaintiff overloading the van with produce. (*Id.* at p. 1022.) The trial court admitted evidence of the plaintiff's infidelity in part to show he had a motive to overload the van. He needed to make more money to support two families because, although he was married at the time, he fathered two children with a woman in Las Vegas and whom he supported financially at times. He also married and divorced another woman in Las Vegas. (*Id.* at pp. 1023-1024, 1027.)

The Court of Appeal reversed for a new trial. (*Winfred D., supra*, 165 Cal.App.4th at p. 1027.) An extramarital affair may be admissible where it has a connection to a substantive issue and goes to motive. (*Id.* at p. 1026.) But the plaintiff's extramarital affairs were irrelevant to the substantive issue in the case: the cause of the accident. (*Id.* at p. 1029.) In criminal law, evidence that a defendant supported a mistress and frequently gambled may be admissible to prove that his financial condition led him to commit tax fraud or robbery if the record in the case refers to the amount of money spent. (*Id.* at p. 1037.) Evidence of the amount the plaintiff had spent was

"virtually nonexistent." (*Ibid*.) There was no proof the plaintiff had supported one family, much less two, and if so, in what amounts. (*Id*. at pp. 1037-1038.)

Thus, there was insufficient evidence to support the manufacturer's theory that the plaintiff overloaded the van because he had to support two families, and the motive theory did not provide a basis for admitting evidence of the plaintiff's extramarital affairs or the existence of his illegitimate children. (*Winfred D., supra*, 165 Cal.App.4th at pp. 1037-1038.) Moreover, proof of a person's lack of money to establish motive, "without more, is likely to amount to a great deal of unfair prejudice with little probative value." (*Id*. at p. 1038, italics omitted.)

Unlike in *Winfred D*., evidence of defendant's infidelity was relevant to the substantive issue before the jury: who shot Keela. While the plaintiff's motive in *Winfred D*. was not relevant to determining whether overloading the van caused the accident, defendant's motive for killing Keela was highly relevant as evidence that defendant may have been the shooter. The evidence shows that defendant, at a time close to the murder, was angry to the point of violence with Keela based on her objections to his infidelity, which is in turn evidence of a potential motive harbored by defendant in killing her. Because the evidence was probative and relevant, the danger of prejudice weighed less than it did in *Winfred D.* The trial court did not abuse its discretion denying defendant's motion for mistrial by determining the evidence was admissible and that its probative value was not substantially outweighed by its prejudicial impact.

IV

*Jury Instruction on Consciousness of Guilt*

CALCRIM No. 371 instructs a jury that if it determines the defendant tried to hide evidence, his conduct may show he was aware of his guilt. Defendant contends the trial court erred by instructing the jury with CALCRIM No. 371, arguing there was insufficient evidence that he may have suppressed the gun and other evidence.

A.       Background

The prosecutor requested the trial court instruct the jury with CALCRIM No. 371. She argued there was circumstantial evidence that defendant got rid of the gun prior to returning to the scene. Defendant put the gun in the purse before he left Keela's apartment, and the Ring camera footage showed defendant wearing the purse as he left the complex. When he returned to the scene, he was not wearing the purse. The car he used was found, and the purse was inside the car, but the gun was missing.

Defense counsel opposed the request. He argued there was no evidence that supported giving the instruction, and there was no evidence defendant had the intent to hide the gun if he in fact had it when he left the apartment.

The trial court announced it would take the request under submission. The record does not contain any further discussion by the court on whether it would instruct with CALCRIM No. 371.

Nonetheless, the prosecutor referenced the instruction in her closing argument. Discussing what the circumstantial evidence established about defendant, the prosecutor told the jurors they would be instructed that if defendant tried to hide evidence, this conduct could also show he was aware of his guilt. Similarly, another instruction would inform the jurors that if defendant fled after the crime was committed, his conduct could show he was aware of his guilt.

The prosecutor continued: "The defendant, as soon as those shots were fired, hightailed it out of there. He was the first to leave and he got into a car and he left. That flight, getting out of there before law enforcement arrives, shows his consciousness of guilt. But more than that, when he returns and feigns that he doesn't know what's happening, even though we know the shots were fired at 1:40, he returns with different clothes. He's hiding the evidence of what he was wearing when he shot. He returned

39

without the purse. And when they ultimately find the purse it's darn near empty because that gun, the murder weapon, is not there."

The trial court instructed the jury with CALCRIM No. 371 as follows: "If the defendant tried to hide evidence, that conduct may show that he was aware of his guilt. If you conclude that the defendant made such an attempt, it is up to you to decide its meaning and importance. However, evidence of such an attempt cannot prove guilt by itself."

B.    Analysis

A defendant's willful suppression or attempted suppression of evidence is admissible to prove consciousness of guilt. (*People v. Edelbacher* (1989) 47 Cal.3d 983, 1007; Evid. Code, § 413.) Before a jury can be instructed that it may infer a consciousness of guilt from a defendant's suppression of adverse evidence, " 'there must be some evidence in the record which, if believed by the jury, will sufficiently support the suggested inference.' " (*People v. Hart* (1999) 20 Cal.4th 546, 620.) The record need not establish that the evidence was actually destroyed before the jury can infer the defendant suppressed the evidence. (*Ibid*.) Whether any set of facts may constitute suppression of evidence from which a jury can infer a defendant's consciousness of guilt is a question of law. (*Ibid*.)

Defendant contends there is no evidence showing he suppressed evidence by getting rid of the gun supposedly in his possession or by changing clothes after the shooting. He asserts the most that can be said is the gun was never found. Similarly, he claims there is no evidence he hid the clothes he was wearing at the time of the shooting, disposed of them, or that they were even missing.

We conclude that sufficient evidence supported the trial court instructing the jury with CALCRIM No. 371. The evidence shows that defendant possessed the gun before and after the shooting. Damphier saw defendant pull the gun out of his shirt on the night

40

of the shooting and saw it in his right hand after the shooting. Taylor saw defendant put the gun into the purse seconds after hearing the shots. Someone in the room told defendant to put the gun away. Defendant left the apartment first. As he walked by Tyra's apartment, he was wearing the purse over his shoulder. The group walked to their cars, and defendant drove off in Taylor's Kia. Later, when defendant returned, he was not wearing the same clothes he had worn when he left the apartment, nor was he wearing the purse he had put the gun in after he shot Keela.

Inside Taylor's car, detectives found the purse defendant had been wearing on the front driver's seat. A gun was not inside the purse nor was one inside the car. Criminalists, however, detected gunshot residue from samples taken from inside the purse and from defendant's hands after he was apprehended.

This evidence sufficiently supported the inference that defendant suppressed the gun and thus was conscious of his guilt. The gun he had kept in the purse was removed from the purse after the shooting and was not found. The jury could reasonably infer that defendant removed the gun from the purse to hide or destroy it. The trial court did not err in instructing the jury with CALRCIM No. 371. Because we conclude the court did not err by instructing with regards to suppression of the gun, we need not discuss whether the court erred by giving the instruction with regards to defendant's change of clothes after the shooting.

V

*New Trial Motion Based on Newly Discovered Evidence*

Upon a defendant's application, a trial court may grant a new trial when, among other circumstances, "new evidence is discovered material to the defendant, and which he could not, with reasonable diligence, have discovered and produced at the trial." (Pen. Code, § 1181, ¶ 8.)

41

Defendant applied for a new trial based on a sworn declaration made by LeAndrew Smith's former girlfriend that Smith confessed to her he killed Keela and he intended to frame defendant for the murder. The trial court denied the motion, finding the evidence not credible and ruling it was not reasonably probable the evidence would have affected the outcome of defendant's trial. Defendant contends the trial court abused its discretion in denying the motion.

A.    Background

Defendant based his motion for new trial on the sworn declaration of Alisa Oneal. Oneal is Smith's former girlfriend and the mother of Smith's child. She declared that Smith came to her mother's home where she and her baby were residing. It was late at night, and Smith was frantic. He grabbed Oneal by the neck and told her they were leaving. He dragged her towards her BMW X3, which he had been driving. As he did, the boyfriend of Oneal's sister, who had been sitting in his car in the driveway, got out of his car and asked Smith what was going on. Smith drew a gun from his waistband and pointed it at the man.

Oneal's mother came out of the house and told Smith and Oneal to leave, as they were disturbing the children. As Smith pushed Oneal into the BMW, he told her he had just shot defendant's girlfriend. Smith said defendant "had snitched on [Smith's] homeboy, gave him life (in prison), and now he [Smith] was going to give [defendant] life (in prison)."

Smith took Oneal to an unknown address and held her there against her will "for several days." He beat her during this time. "Several days later," Oneal was able to get away from Smith as a result of a high speed pursuit by police which ended in a collision and Smith's arrest.

Oneal stated Smith was very dangerous, and she feared for her safety. She made the declaration because Smith admitted shooting the woman "shortly after it happened,"

and Oneal did not want an innocent man spending his life in prison for a crime he did not commit.

At defendant's preliminary hearing, Smith testified that after the homicide, he drove to the home of another girlfriend, Oneal. Defense counsel engaged Steven Anderson, a private investigator, to locate Oneal. Anderson detailed his efforts to locate Oneal in a sworn declaration. On July 31, 2023, after trial had concluded, counsel learned that Oneal was in custody at the Rio Consumnes Correctional Center in Elk Grove, and he assigned Anderson to interview her there. Anderson interviewed Oneal on August 9, 2023. The following day, August 10, he gave her a declaration reciting the salient points from her interview. Oneal signed the declaration. (For reference purposes, jury voir dire began in defendant's trial on June 12, 2023, and the verdicts were read on June 26, 2023.)

That same day, August 10, Anderson interviewed Oneal's mother, Lisa Robinson. Robinson recalled the event. She told Anderson that around 11:00 p.m., Smith came to the house, pounded on the door, and yelled at Oneal saying, " 'We got to go.' " Robinson did not see Smith grab Oneal by the neck, but she did see him push and grab her towards the car. The following day, Oneal came inside the house to get her belongings while Smith waited outside. Oneal was frantically trying to collect her things while Smith yelled at her to hurry up. A moment later, Robinson heard a gunshot outside her home. Robinson told Anderson that Smith physically and emotionally abused Oneal frequently.

Meanwhile, defense counsel and Anderson learned that the vehicle collision Oneal referenced in her declaration had occurred on September 2, 2021, six weeks after Keela was shot.

In the motion for new trial, defense counsel argued that the evidence and its materiality were newly discovered, the evidence was not cumulative, and it would render a different result probable in a retrial. Oneal's declaration provided proof of defendant's innocence, and it opened the door for defendant to present his defense based on third

43

party culpability. Counsel also argued the evidence could not with reasonable diligence have been discovered and produced at trial. Counsel asserted that Oneal's declaration was "the best evidence of which the case admits."

The trial court found that defendant had been diligent in trying to obtain the evidence. But it ultimately concluded it was not probable that one or more jurors would have changed their vote if the new evidence was introduced. To reach this conclusion, the court reviewed the evidence as it related to defendant and Smith and, if a new trial were granted, defendant's argument that, based on Oneal's declaration, Smith was the actual killer and therefore reasonable doubt existed as to whether defendant was guilty.

Shayla Taylor testified that she heard two shots behind her. She did not see who fired the shots, but after the shooting, she saw the gun in defendant's hands and saw him put the gun into the case or fanny pack. After the group left the apartment, she, Damphier, and Smith sat in a car for about five seconds before she got out. Taylor had intended to take her car, but she could not see it. When officers searched her car later that day, they found a bag Taylor recognized as the bag defendant had worn and in which he had put the gun.

Analyzing Taylor's testimony, the trial court stated: "If this was a conspiracy or agreement to set up [defendant], she would not have had enough time to concoct a story as she also testified that she intended to leave in her car, but that [defendant] took it. There is no logical explanation for the fact that the purse without the gun was found in her car, presumably left by defendant after returning to the apartment. According to Taylor, the defendant had the purse with the gun inside when they left the apartment. If Smith took the gun out of the purse, shot Keela and returned it to the purse, why would the defendant drive off with the gun and the purse? And even assuming he didn't know about the gun 'being put back in the purse', if Smith was the actual perpetrator, why would the defendant not preserve the gun so that forensic evidence such as Smith's fingerprints could be obtained? Instead it was never located after he drove off.

44

"More importantly, if this was a plan to frame [defendant], Ms. Taylor's testimony would have [been] less equivocal. In other words, she would not have simply testified that she heard shots behind her and from the area of the defendant. She likely would have testified that she **saw** the defendant shoot Keela. Instead, she testified only that she saw the gun in the defendant's hands a few seconds after the shooting.

"In addition, Ms. Taylor initially lies to the police about being in the apartment at all. She fabricates a story about visiting a family member and not knowing the people in apartment 10. If she were part of a conspiracy to frame [defendant] for the murder, why would she initially lie about being present in the apartment and why would she not implicate [defendant] in her first encounter with law enforcement?"

Antoinette Damphier testified that she was in the living room talking with Keela when defendant woke up, walked into the kitchen, threw his plate of spaghetti in the sink, and then shot Keela twice in the back of the head. She did not see a gun in defendant's hands, but she concluded he had shot Keela because he was standing closest to her, and he would have been shot by the same bullets if he were not the shooter. She also believed defendant was the shooter by the look in his eyes. She testified that she and Smith went to Smith's other girlfriend's house and stayed there for a few hours.

The trial court stated about Damphier's testimony, "Again, if the witnesses were attempting to frame the defendant for Keela's murder, Ms. Damphier would have been less equivocal about what she saw and heard. She said she thought he was the shooter because of 'the look in his eyes.' "

LeAndrew Smith testified he did not see defendant pull the gun out and shoot. He just heard two shots. He did not know Keela was shot and thought someone had shot in the air. Smith admitted he did not see defendant shoot and he never saw the gun. He also said he, Damphier, and Taylor stayed in the car only for a short period, long enough to decide who was not wanted on outstanding warrants and should call law enforcement.

Of Smith's testimony, the trial court stated, "This corroborates Damphier and Taylor's testimony. It does not seem possible that the three individuals could come up with a story to implicate the defendant in the five minutes or so that they were in the car. If Smith was trying to frame the defendant for the shooting, he would have testified that he actually saw the defendant with a gun and that he saw the shooting, but instead he testified to the contrary."

The court recognized Sara O.'s testimony of hearing arguments from Keela's apartment. The court stated the evidence "could have been considered by the jury for both the defendant's character for committing acts of domestic violence, and a motive."

The trial court also reviewed the forensic evidence. It was "not the most compelling evidence" against defendant, but it did reveal facts not inconsistent with defendant being the shooter. Keela was shot with a small caliber handgun, which defendant had been known to carry in a small purse. Gunshot residue was found on both of defendant's hands and inside the purse defendant had carried. Defendant's DNA was found on the purse strap.

With this trial evidence in mind, the trial court reviewed Oneal's declaration for credibility. It found "several improbabilities" with her statement: "The homicide occurred on July 20 and the chase/collision involving Smith and Oneal occurred on September 2, six weeks later. In a forced captivity situation, it does not seem reasonable to mistake six weeks of captivity for several days. Ms. Robinson told the investigator that Oneal returned to the house to gather her things. This would seem to contradict Oneal's statement that she was somehow held against her will.

"When law enforcement arrested Smith after the chase and collision, Oneal was in the car, but she never told law enforcement that she was being held against her will. Instead, she lied to law enforcement about her true identity. It is implausible to believe that she would not immediately inform law enforcement about her captivity if this were in fact, the true situation." (Fn. omitted.)

46

Based on these discrepancies, the trial court found Oneal's declaration to be "inherently implausible." It stated: "It defies common sense that [Oneal] would not immediately tell law enforcement if she was being held against her will after the chase and crash. The timeline as recited in her declaration does not make sense as well – it does not seem believable that she would confuse a couple of days with over six weeks between the homicide and when the chase and crash occurred.

"The defense theorizes that this was a setup by Smith. However, he was reluctant to testify until granted immunity, he was hostile on the stand while testifying during the trial, and he never unequivocally identified defendant as the shooter. One would surmise that if he were trying to frame the defendant for the shooting, his testimony would directly implicate the defendant, but in the Court's view, he did not.

"Finally, the defendant points out that Ms. Oneal's reluctance to testify or be located is indicative of her fear of Mr. Smith in implicating him in the crime. But it is also equally indicative of the fact that she may have committed perjury in signing the declaration and to further testify would only expose her to more legal jeopardy. Both theories are equally speculative." (Fn. omitted.)

The trial court had continued the hearing on the motion for new trial to allow the defense to locate Oneal, who had since been released from custody, and to subpoena her as a witness for the hearing on the motion. This would have allowed the court to evaluate whether there was substantial merit to the motion or whether Oneal may have perjured herself in her declaration. However, Oneal had not been located, and her whereabouts were unknown.

Having evaluated the credibility of the witnesses who were present at the shooting, the trial court carefully considered their testimony and found them, "while not completely forthcoming, credible." Based on its analysis of the evidence, the trial court found the new evidence would not affect the outcome of trial, and it denied the motion for new trial.

47

B.     Analysis

"In ruling on a motion for new trial based on newly discovered evidence, the trial court considers the following factors:  ' "1.  That the evidence, and not merely its materiality, be newly discovered; 2.  That the evidence be not cumulative merely; 3.  That it be such as to render a different result probable on a retrial of the cause; 4.  That the party could not with reasonable diligence have discovered and produced it at the trial; and 5.  That these facts be shown by the best evidence of which the case admits." ' " (*People v. Delgado* (1993) 5 Cal.4th 312, 328.)  The trial court considers the new evidence's credibility and materiality when determining whether the evidence's introduction in a new trial could render a different result reasonably probable.  (*Id*. at p. 329.)  The trial court's determination of a motion for new trial rests so completely within the court's discretion that we will not disturb its ruling unless a manifest and unmistakable abuse of discretion clearly appears.  (*Id*. at p. 328.)

Defendant argues the new evidence probably would render a different result in a retrial.  In other words, it is probable on retrial that at least one juror would have voted to find him not guilty had the new evidence been presented.  (*People v. Soojian* (2010) 190 Cal.App.4th 491, 521.)  The new evidence went to the single issue of disputed fact before the jury, the identity of the shooter.  Defendant asserts that if Oneal's testimony was believed, he would have been found factually innocent.  Without Oneal's evidence, he was precluded from pursuing a defense based on third party culpability.  Under the circumstances, that left defendant arguing in a vacuum that he was not the shooter. Defendant claims that Oneal's evidence dramatically increased his chances of obtaining a different result on retrial, and the trial court abused its discretion in several ways in concluding otherwise.

We will address defendant's arguments individually.  The trial court found it improbable that Smith, Taylor, and Damphier conspired to frame defendant in part

48

because after the shooting they were not together in the car a sufficient length of time to concoct a fake story implicating defendant. Defendant argues that the court's focus on that fact was misplaced. The conspiracy was not necessarily formulated in those few minutes. Taylor initially lied about her involvement and did not mention seeing defendant with a gun until hours later at the police station. Taylor thus had several hours to come up with a story implicating defendant after she got out of Smith's car. She also had time to contact Smith and Damphier by text or other form of cell phone communication, and Smith could have directed them both on what to say. And even if the three witnesses did decide to frame defendant only during those few minutes while they were together inside the car, it would not have taken much time to make that decision. Smith could have told Taylor and Damphier to say that defendant shot Keela, and that would have been it.

There is no evidence, however, that Taylor was in touch with Smith or Damphier during the several hours between the arrival of the police and her interview at the police station. Defendant speculates that Taylor could have contacted Damphier or Smith during that time, but his speculation is not evidence she did. And it was not unreasonable for the trial court to conclude that insufficient time transpired while the three were inside Smith's car to decide to frame defendant. The evidence is the three decided over the course of five seconds that Taylor should call 911 because she did not have warrants out on her, and then Taylor got out of the car. Even if Smith had simply told Taylor and Damphier to say defendant shot Keela, it is unlikely the three would have tried to frame defendant individually by concocting stories that none of them saw defendant shoot Keela, which was their testimony.

The trial court also found a conspiracy improbable because of the witnesses' equivocal testimony. Defendant argues that this does not mean they did not falsely implicate him. Although they were friends with defendant, framing him was necessary if

49

Smith was not going be held accountable. And each of them indirectly implicated defendant. Their equivocality could have reflected their ambivalence.

But just as equally, their equivocality could have reflected their honesty in their testimonies implicating defendant. Their friendship with defendant could have kept them from being more forthcoming about what they witnessed. In any event, the trial court found them to be credible, and we must accept the trial court's credibility determinations if they are supported by substantial evidence. (*People v. Verdugo* (2010) 50 Cal.4th 263, 308.) Here, substantial evidence supports the court's credibility determination in the form of the forensic evidence, Tyra's surveillance video, and the evidence of defendant's prior domestic violence against Keela.

Defendant argues the physical evidence was not so overwhelming against him that Oneal's testimony would not have made a difference in the outcome. DNA on the purse was not significant because it was not disputed that the purse belonged to him. The issue was whether he was the person who fired the gun he usually carried in the purse. The gunshot residue on his hands did not necessarily mean he fired the gun. And the gunshot residue in the purse did not indicate when the gun was fired or how long the particles had been present.

The trial court acknowledged the evidence of defendant's DNA on the purse strap did not add much. At the same time, the evidence did not support defendant's claim that Smith was the shooter. And the limitations of the gunshot residue evidence notwithstanding, the evidence is substantial evidence in support of the trial court's determination that Taylor, Damphier, and Smith were credible witnesses. So, too, was the fact the bullet recovered from Keela's head indicated it had most likely been fired from a revolver, the same type of gun Tyra had seen defendant possess before the day of the shooting and the type of gun Taylor described seeing defendant put in the purse seconds after the shots were fired.

50

Regarding the discovery of the purse without the gun inside, the court believed that if Smith had shot Keela, defendant would have preserved the gun so that Smith's fingerprints could be obtained. Instead, the gun was never located after defendant drove off. Defendant argues the record does not show what happened with the gun after the shooting. That a surveillance video showed defendant with the purse as he and others left the complex after the shooting did not mean the gun was inside the purse. And if it was, he argues that did not mean Smith did not place the gun inside the purse after the shooting.

Defendant's arguments offer only alternative explanations of the evidence. They do not establish that the court's credibility determinations lack substantial evidence. Moreover, defendant's proffered scenario that Smith returned the gun to the purse after using it was reasonably rejected by the trial court. If Smith was the shooter, the defendant would have likely preserved the gun to implicate Smith.

Defendant claims the evidence of his domestic violence did not mean his actions would escalate to murdering Keela. Although there was evidence that defendant was violent towards Keela, and the jury was instructed it could consider this evidence for propensity and conclude defendant murdered Keela, Tyra testified that defendant was remorseful and upset at himself for causing Keela's black eye. Also, there is a large difference between striking someone in the face and shooting someone in the head.

However, it was not unreasonable for the jury and the trial court to believe otherwise. When the Legislature enacted Evidence Code section 1109 making other acts of domestic violence admissible as propensity evidence in an action on an offense involving domestic violence, it stated that, " '[n]ot only is there a great likelihood that any one battering episode is part of a larger scheme of dominance and control, that scheme usually escalates in frequency and severity. Without the propensity inference, the escalating nature of domestic violence is likewise masked. If we fail to address the very essence of domestic violence, we will continue to see cases where perpetrators of this

51

violence will beat their intimate partners, even kill them, and go on to beat or kill the next intimate partner.' " (Assem. Com. Rep. on Public Safety Report (Jun. 25, 1996) pp. 3-4, quoted in *People v. Hoover* (2000) 77 Cal.App.4th 1020, 1028.) The trial court did not act unreasonably in relying in part on the domestic violence evidence.

Defendant contends the trial court overstated the significance of inconsistencies in Oneal's declaration. When Oneal claimed Smith held her for "several days" when in fact the time from the shooting to the accident where Smith was arrested was six weeks, Oneal may have been speaking colloquially rather than literally. And even if Robinson was correct that Oneal returned the next day, that does not mean she was not held against her will. Smith could have allowed Oneal to collect her belongings while he watched and made sure she did not flee.

It was not unreasonable for the trial court to believe that Oneal's description of being held for "several days" until the collision was inconsistent with the fact the collision occurred six weeks after the murder. There is evidence Smith exerted pressure on Oneal while she was retrieving her belongings from home. Robinson told the investigator that Smith yelled at Oneal from outside, and Robinson heard someone fire a gun. But it was not unreasonable for the trial court to consider this evidence in the larger context of Oneal's claims. When Smith was arrested after the collision and Oneal was in the car, Oneal never told the officers she was being held against her will. As the trial court observed, it is implausible she would not have informed the officers immediately about her captivity if it was true. This credibility determination was reasonable.

Defendant argues that while focusing on these inconsistencies, the trial court ignored other aspects of Oneal's declaration that made it credible. Her claim that Smith admitted to framing defendant was credible because she was not at the scene of the murder. She would not know that defendant was even present at the scene unless Smith truly confessed to the shooting and then sought to frame defendant. And Oneal's fear of Smith—eventually leading to her disappearance—lends credibility to her testimony.

Unless her statement was true and unless she felt compelled to prevent an innocent man from going to prison, she would not have gone against Smith and risked his violent reaction.

As the Attorney General argues, defendant ignores the obvious explanation for how Oneal knew that defendant was present at the shooting: Smith told her that defendant had shot Keela. And, as the trial court stated, Oneal's reluctance to testify is equally indicative that she may have committed perjury in signing the declaration, and testifying would only expose her to more legal jeopardy. Defendant asks why would Oneal sign a sworn declaration under penalty of perjury that Smith confessed to killing Keela if it was not true? One reasonable possibility is because she wanted to frame Smith, her former boyfriend, who, according to Robinson, physically abused Oneal during their relationship.

Defendant asserts Oneal's declaration is credible as there is no indication she made her statement under pressure from defense counsel and his investigator. She had a full day from giving her statement to signing her declaration to reconsider, yet she readily signed. If she had felt pressure, she had time to retract. That she continued to maintain that Smith confessed to the shooting and still signed the declaration indicates the information in the declaration was legitimate. But this fact is unconvincing given Oneal's later reluctance to testify or be located. Her disappearance could indicate she committed perjury when she signed the declaration.

In summary, the trial court did not abuse its discretion in determining that Oneal's declaration was not credible and would not have rendered a different result on a retrial. Its credibility determinations are supported by substantial evidence, and its analysis of the weight of the evidence is not arbitrary or unreasonable. We will not reverse its decision.

DISPOSITION

The judgment is affirmed.

_____
HULL, Acting P. J.

We concur:

_____
KRAUSE, J.

_____
WISEMAN, J.*

---

\* Retired Associate Justice of the Court of Appeal, Fifth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.